## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| POLO BUILDERS, INC., *et al.*, | ) | Joint Case No. 04 B 23758 |
| | ) | |
| Debtors. | ) | Honorable A. Benjamin Goldgar |
| —————————————————— | ) | |
| | ) | |
| DAVID R. BROWN, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 06 A _____ |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN S. DRAVIAM, | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————————— | ) | |

### ADVERSARY COMPLAINT TO AVOID
### FRAUDULENT TRANSFERS AND FOR RELATED RELIEF

David R. Brown, the chapter 7 trustee (the "*Trustee*") appointed in the above-captioned,

jointly-administered bankruptcy cases, hereby alleges for his Complaint, upon information and

belief as to all matters, as follows:

### NATURE OF THE ACTION

1.    This action arises from a fraudulent scheme orchestrated by the Debtors (as

defined *infra*), and in particular, the principal of the Debtors, Hasan Merchant ("*Merchant*"), in a

wide-ranging effort to obtain financial gain for certain investors, including Merchant, while

fleecing other investors.  The vehicle for this fraud was an illegal "Ponzi" scheme (the "*Ponzi

Scheme*"), whereby the Debtors promised large returns to investors by continually using recent

investments (collectively, the "*Investments*") to satisfy previous investments without actually

creating anything of value.  This scheme embraced a broad range of unlawful activity – creation

of false contracts, forgery, embezzlement, bribery, and even immigration fraud.  In the end, some of the Debtors' largest investors and associates, and others in charge of the scheme, did receive the payments promised to them, though many investors were simply defrauded of their Investments.

2.      Numerous individuals participated in the unlawful Ponzi Scheme by providing capital to the Debtors in furtherance of the Ponzi Scheme, through both the purchase of promissory notes and through a novel scheme involving kickbacks received from down payments toward properties being constructed by the Debtors, and by receiving, among other things, interest and principal payments on account of their Investments in the Ponzi Scheme.

3.      While some participants had no knowledge of the Ponzi Scheme, and believed that they were investing in a legitimate real estate development enterprise, other participants knew of, and actively participated in, the Ponzi Scheme.  Such knowing participants frequently asserted undue influence over the Debtors in order to extract payments from the Debtors that other investors in the Ponzi Scheme did not receive.

4.      Through this action, the Trustee seeks to avoid and recover fraudulent transfers made by or for the Debtors to or on behalf of the Defendant.

**PARTIES**

5.      The Trustee was appointed by the Office of the United States Trustee on August 16, 2004, to administer the bankruptcy estates of the Debtors.

2

6.     The Defendant was either an individual Investor (as defined *infra*) in the Ponzi Scheme or otherwise received or benefited from transfers (the "*Transfers*")[1] from or on behalf of the Debtors in the period prior to the relevant Petition Date (as defined *infra*).

## OTHER RELATED INDIVIDUALS

7.     Merchant was the 100% owner, president, and sole director of Polo (as defined *infra*). Merchant was also a 50% owner of Debtor MG International, L.L.C. ("*MG*")[2], as well as its president and sole director.

8.     MG was formed as an Illinois limited liability company in December 1999 by Merchant, along with Drs. Geeta and Narendra Gupta (the "*Guptas*"). Purportedly, Merchant and the Guptas formed MG to develop and market real estate in the greater Chicago metropolitan area.

9.     MZ Enterprises, LLC ("*MZ*")[3] was formed as an Illinois limited liability company in July 1996 by Merchant, along with Dr. Abbas Zarif ("*Zarif*"), purportedly to develop and market real estate in the greater Chicago metropolitan area. MZ was voluntarily dissolved in December 1999.

---

[1]     The Transfers may include, without limitation, the following: (i) the Note Transfers (as defined *infra*); (ii) transfers made by the Debtors to certain charitable, political, and religious organizations; and (iii) any other actually or constructively fraudulent transfers made by or on behalf of the Debtors in the period prior to the relevant Petition Date.

[2]     "MG" is an abbreviation for "Merchant/Gupta."

[3]     "MZ" is an abbreviation for "Merchant/Zarif."

10.     Debtor Dr. Sheri Banoo Merchant ("*Sheri Merchant*," and collectively with Merchant, the "*Merchants*") is Merchant's wife.   Sheri Merchant ran an obstetrics practice, in part with the funds of the Debtors commingled with the funds of the medical practice.

## JURISDICTION AND VENUE

11.     This adversary proceeding is brought in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

12.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.   Venue in this adversary proceeding in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), and (K).

14.     The Trustee, on behalf of the Debtors' bankruptcy estates, holds an interest in the avoidance of the Transfers pursuant to sections 541, 544, 548, 550, and 704 of title 11 of the United States Code (the "*Bankruptcy Code*").

15.     This adversary complaint is brought timely pursuant to this Court's order entered on August 2, 2006.

## BACKGROUND FACTS

**I.     The Debtors and the Bankruptcy Filings**

16.     On June 23, 2004 (the "*Initial Petition Date*"), Merchant, Polo Builders, Inc. ("*Polo*"), M&MM Enterprises, LLC ("*M&MM*"), and Sheri Merchant (collectively, the "*Initial Debtors*") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

17.     On June 29, 2004 (and collectively with the Initial Petition Date, the "*Petition Dates*"), MG (and collectively with the Initial Debtors, the "*Debtors*"), filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

18.     On August 16, 2004, the Court entered an order converting the bankruptcy cases to proceedings under chapter 7 of the Bankruptcy Code.

19.     In exchange for receiving bankruptcy discharges, the Merchants ultimately agreed to a settlement in the bankruptcy cases. Pursuant to the settlement, which was approved by this Court on June 1, 2005, the Merchants agreed to make payments to the Trustee in the amount of $4 million.

20.     Merchant formed Polo, MG, and M&MM ostensibly to pursue various real estate projects and acquisitions within the Chicagoland real estate market, and to develop and build homes and similar residences in the greater Chicago metropolitan area.

## II.    The Ponzi Scheme

### A.     Marketing of the Scheme

21.     Although they marketed themselves as a legitimate real estate developer, in truth, the Debtors were operated as part of an illegal "Ponzi" scheme in which fictitious profits were paid to investors from the principal sums deposited by subsequent investors.

22.     Upon information and belief, in or about November 2000, the Debtors began soliciting and selling notes (the "*Notes*") to various investors (the "*Note Investors*").

23.     However, the Debtors had engaged in Ponzi-type investment schemes long before the commencement of the Ponzi Scheme. After forming MZ, Zarif learned of the Ponzi scheme being operated by Merchant. As a result, Zarif threatened to contact the authorities. Subsequently, MZ was dissolved, and Merchant replaced Zarif with the Guptas, forming MG to replace MZ.

24.     The Ponzi Scheme primarily relied upon the Note Investors, who provided cash Investments to the Debtors in exchange for the Notes. The Notes often promised periodic interest payments (the "*Note Transfers*") that were far above market rates, and in some cases,

thirty percent (30%) annually. Moreover, the Note Investors were to receive balloon principal payments on the maturity date of the Notes.

25.    Some of the Notes were evidenced by loan agreements (the "*Loan Agreements*") executed with the Note Investors, which set forth the interest rate and payment and maturity schedule, among other terms.

26.    The Debtors, however, did not hold significant assets backing the Notes, other than the cash Investments they received from the Note Investors.

27.    Accordingly, any representations by Merchant (or his agents) that adequate assets existed to back the Notes were false.

28.    From the time that the Debtors commenced the Ponzi Scheme through June 23, 2004 (the "*Ponzi Scheme Period*"), the Debtors succeeded in obtaining Investments from the Note Investors in a sum exceeding $24.46 million. Although the Trustee is presently aware of at least $24.46 million in Investments, excluding the $10 million capital contribution made by the Guptas in MG, as well as loan proceeds received by the Debtors from their institutional lenders that numbered in the tens of millions of dollars, ongoing investigation suggests that even greater sums are at issue.

29.    Funds received by the Debtors from the Note Investors were:  (i) used to pay the interest and principal on Notes previously issued; (ii) improperly transferred by Merchant among the various Debtors for no consideration; or (iii) used for Merchant's personal benefit or for other purposes.

30.    The Ponzi Scheme defrauded numerous parties, including certain Note Investors that did not have knowledge of the Ponzi Scheme.

31.    With the proceeds of the Ponzi Scheme, the Debtors took additional actions that harmed the Debtors' unsecured creditors.  For example, Merchant had, on numerous occasions, taken earnest money deposited in connection with a pending property sale, and used such funds to pay expenses of the Debtors, or pocket the funds for his personal use, rather than, as required by applicable law, depositing such funds into an escrow account.

32.    Upon information and belief, the Debtors also carried out a scheme whereby Merchant would allow certain of the Debtors' properties to proceed through foreclosure and then, through a private group, reacquire these same properties at a substantial discount. Merchant would then sell the properties at a substantial profit, pocketing the proceeds for his personal use.

**B.    Operation of the Ponzi Scheme**

33.    The Ponzi Scheme consisted of several elements revolving around properties owned by the Debtors.  Two significant fundraising tools used by the Debtors were:  (a) the Notes; and (b) down payments associated with construction contracts.

(i)    *The Notes*

34.    Certain Note Investors had an objective basis to believe or were aware that the Debtors did not hold significant assets or real property to cover the Debtors' obligations under the Notes.

35.    Certain Note Investors had an objective basis to believe or were aware that the Notes were not secured by any real property held by the Debtors.

36.    The Debtors generally financed the interest payments due under the Notes in two ways.  First, Merchant and others continually recruited new Note Investors into the Ponzi Scheme, and used the principal Investments of these new Note Investors to make interest payments on Notes issued to prior Note Investors.

37.    Second, the Debtors fraudulently obtained additional credit from some of their existing institutional lenders. Specifically, the Ponzi Scheme utilized "strawmen" purchasers to create the appearance that certain of the Debtors' properties had been sold when, in fact, they had not. Such "strawmen" would create the false appearance that they had purchased certain unsold units from the Debtors. This would allow the Debtors to obtain credit from lending institutions that required proof of a certain percentage of unit sales as a condition of extending such credit.

(ii)    *Construction Contracts*

38.    Another aspect of the Ponzi Scheme involved the Debtors' agreement to build homes for certain investors (the "*Construction Investors*").[4] In exchange for the promise of a new home, the Construction Investors would tender to the Debtors an initial down payment of twenty to thirty percent (20% - 30%) of the purchase price.

39.    In an unorthodox arrangement, the Debtors would then typically promise to repay to a Construction Investor twenty percent (20%) of this down payment (the "*Construction Repayment*") at closing. The closing statements evidencing these home purchases did not, however, reflect these repayments. The Debtors financed this scheme, in part, by using each additional down payment they received from a new Construction Investor to pay the preceding Construction Investor.

40.    In some instances, the Debtors actually did build the homes as promised and complied with their contractual obligations.

---

[4]    The Note Investors and the Construction Investors are hereinafter referred to collectively as the "*Investors*."

41.     More often, however, the Debtors would accept down payments on new homes, but lacked sufficient funds to complete construction on such homes.  Thus, scheduled closings would be postponed while the Debtors sought to obtain adequate funds to complete the construction of the home.

42.     And even more often, the Debtors failed to build the property as promised, and a would-be purchaser would either sell the property back to the Debtors or, in some instances, receive no return whatsoever on funds paid to the Debtors.

43.     As a result, the Debtors would reap the benefit of the funds invested by the Construction Investors without providing the purchaser with a new home.

44.     The solicitation of Construction Investors, and the receipt of down payments from the Construction Investors, helped further promote and sustain the Ponzi Scheme.

**C.      In-Kind Transfers to Investors under the Ponzi Scheme**

45.     The Debtors made payments to the Investors on account of their Investments in a variety of ways.  Although some Investors, especially the largest Investors, did receive cash payments consistent with their Loan Agreements or agreements reached with the Debtors as to the Construction Repayments, the majority of smaller Investors received no return on their Investments.

46.     Initially, the Ponzi Scheme ran smoothly enough that the Debtors were able to make the promised payments to their Investors.  Financial statements demonstrate that Merchant and other significant Investors obtained returns well over their initial investments, despite the Debtors' inability to operate their alleged businesses in a profitable (or even cash-flow positive) manner.

47.     In the beginning of the Ponzi Scheme Period, the Debtors' fundraising efforts met with great success, and the Debtors quickly built their list of Note Investors at least in part, as is

9

typical in pyramid schemes, based on testimonials by those early investors regarding the large dividends derived. As of the Initial Petition Date, upon information and belief, the roster of Note Investors totaled in the hundreds.

48.     The Debtors also met with great success initially in recruiting Construction Investors, based on the promise of substantial Construction Repayments.

49.     As stated, the Debtors kept the Ponzi Scheme in operation by essentially paying prior Investors with money obtained from the subsequent Investors. Thus, in order to meet their obligations and to keep the Ponzi Scheme running, it was necessary to continually recruit new Investors.

50.     In time, the Debtors were unable to maintain their Note commitments, as well as the Construction Repayments, and began to try to meet their commitments by providing non-cash benefits (the "*In-Kind Transfers*") Investors, as set forth below. In certain cases, these In-Kind Transfers were also provided to individuals other than Investors, without fair consideration.

      (i)     *Cellular Telephones*

51.     One example of the In-Kind Transfers provided by the Debtors to the Investors is the cellular telephones and service plans paid for by the Debtors.

52.     These cellular telephones and services plans were falsely earmarked for the Debtors' employees, and the Investors receiving these benefits made no payments to the Debtors in exchange therefor.

53.     The Investors benefited from the free use of the cellular telephones at the expense of the Debtors' legitimate creditors.

(ii)    *Fraudulent Immigration Letters*

54.    As an additional method of payment to the Investors, the Debtors provided false immigration letters (the "*Immigration Letters*") that would allow an Investor or an Investor's relative to obtain legal citizenship status in the United States.

55.    The Immigration Letters would falsely claim that a certain individual was an employee of the Debtors, and thus eligible for a visa allowing the individual to work and reside in the United States.

(iii)    *Insurance Benefits*

56.    A third means of providing In-Kind Transfers to Investors was the Debtors' inclusion of Investors within the Debtors' employee insurance and benefit plans (the "*Insurance Benefits*"), despite the fact that these individuals were not bona fide employees of the Debtors and had no right to such benefits.

(iv)    *Ghost Payrolling*

57.    An additional means of providing In-Kind Transfers was to place certain Investors and/or their relatives on the Debtors' payroll, even though these individuals did not actually work for the Debtors.

58.    The Debtors did not receive any services from these Investors, yet issued payroll checks to such Investors on a periodic basis.

59.    The Investors benefited from their placement on the Debtors' payroll at the expense of the Debtors' legitimate creditors.

(v)    *Use of the Debtors' Real Estate*

60.    Finally, the Debtors also provided certain of the Investors (and others) with: (i) heavily discounted condominium units in the Polo Tower development; (ii) free rentals of Polo

Tower units; and (iii) surreptitious repayments from the closing proceeds of properties sold by the Debtors. The Debtors did these things as repayment of Notes and Construction Repayments, and/or in order to pacify Investors until such time as the Investors received their promised investment return.

61.     As noted above, the Ponzi Scheme employed the use of real estate documents as a means for making surreptitious repayments to Investors. The Debtors made these payments by giving an Investor an earnest money credit towards a new property in lieu of the promised investment return. It was the intent of the Debtors that such Investor could then quickly resell the property at a profit, which would offset any unpaid promised investment returns.

62.     In other situations, Investors received payments from the closings on certain of the Debtors' properties in which the Investors were neither the purchaser nor the seller, and in which the Investor had no right to funds from the transaction. Many times, the Debtors allocated a portion of the sale proceeds and included the Investor on the "Real Estate Settlement Procedures Act" (RESPA) form at closing as a recipient of closing proceeds, despite the Investor having no entitlement to the allocated funds.

63.     The Debtors conferred these various benefits on the Investors, in part, as a result of their inability to bring in adequate additional capital to pay off their Note and Construction Repayment commitments. Additionally, the Debtors provided these benefits to prospective Investors in the Ponzi Scheme as an inducement to invest.

64.     The Investors benefited from such real estate related benefits, without consideration, at the expense of the Debtors' legitimate creditors.

**D.    The Demise of the Ponzi Scheme**

65.    The Debtors had an objective basis to believe that they would be unable to pay their debts as they became due.  Upon information and belief, the Debtors intended to incur, or believed they would incur, debts that would be beyond their ability to pay as they matured.

66.    The Debtors ultimately were unable to maintain the constant stream of new Investors they needed in order to maintain the Ponzi Scheme, and the Ponzi Scheme collapsed.

**E.    The Debtors' Non-Ponzi Scheme Transfers**

(i)    *Charitable, Political, and Religious Contributions*

67.    Both Hasan and Sheri Merchant were widely known within their community for supporting a variety of charitable, political, and religious organizations.  Prior to the relevant Petition Date, the Debtors made substantial charitable contributions to numerous organizations and individuals.  Not only did these charitable contributions consist of sizable cash payments, but in the case of, for example, the Anjuman-E-Saife Mosque, the Debtors provided valuable construction materials and services for the construction of the mosque at no cost.

68.    The Debtors received no consideration for the transfers to charitable, political, and religious organizations.  Furthermore, these transfers were made while the Debtors were insolvent, or while they were otherwise unable to pay their non-charitable obligations as they became due.

(ii)    *Other Non-Ponzi Scheme Transfers*

69.    The Debtors made various additional transfers to certain parties that were not directly related to the Ponzi Scheme.  Such transfers included both cash and in-kind payments, such as transfers of the Debtors' real properties.  These transfers were made for no consideration, and were made while the Debtors were insolvent, or in the zone of insolvency.

## COUNT I

### Avoidance of Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(a)(1) and Sections 544 and 548 of the Bankruptcy Code

70.     The Trustee repeats and realleges the allegations of paragraphs 1 through 69 as though fully set forth herein.

71.     As of the relevant Petition Date, unsecured creditors existed that are entitled to avoid the Transfers under applicable non-bankruptcy law pursuant to section 544(b) of the Bankruptcy Code.

72.     The Transfers constitute a transfer of interests in the Debtors' property.

73.     The Transfers were made to or for the Defendant's benefit.

74.     The Transfers were made with actual intent to hinder, delay, or defraud the Debtors' creditors.

75.     The Transfers were made with the Defendant's knowledge to a substantial certainty that later creditors in the Ponzi Scheme would not be paid.

76.     The Defendant knew, or should have known, of the Debtors' fraudulent intent with respect to other creditors.

77.     The Transfers constitute avoidable fraudulent transfers pursuant to section 548 of the Bankruptcy Code and 740 ILCS 160/5(a)(1), as incorporated by section 544(b)(1) of the Bankruptcy Code.

78.     Accordingly, the Trustee may avoid and recover any Transfers made to or on behalf of the Defendant for the benefit of the Debtors' bankruptcy estates pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

(a)     directing that the amount of the Transfers made to or on behalf of the Defendant be paid by the Defendant to the Trustee;

(b)     awarding post-judgment interest, costs, and reasonable attorneys' fees, to the extent permitted by law, through trial and any subsequent appeals; and

(c)     granting the Trustee such other and further relief as is just and proper.

## COUNT II

### Avoidance of Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(a)(2) and Sections 544 and 548 of the Bankruptcy Code

79.     The Trustee repeats and realleges the allegations of paragraphs 1 through 78 though fully set forth herein.

80.     As of the relevant Petition Date, unsecured creditors existed that are entitled to avoid the Transfers under applicable non-bankruptcy law pursuant to section 544(b) of the Bankruptcy Code.

81.     The Transfers constitute a transfer of interests in the Debtors' property.

82.     The Transfers were made to or for the Defendant's benefit.

83.     The Debtors received less than reasonably equivalent value in exchange for the Transfers.

84.     Upon information and belief, the Debtors were insolvent, became insolvent, and/or had unreasonably small capital in relation to their businesses at the time, or as a result of, the Transfers.

85.     The Transfers constitute avoidable fraudulent transfers pursuant to section 548 of the Bankruptcy Code and 740 ILCS 160/5(a)(2), as incorporated by section 544(b)(1) of the Bankruptcy Code.

86.    Accordingly, the Trustee may avoid and recover the Transfers made to or on behalf of the Defendant for the benefit of the Debtors' bankruptcy estates pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

(a)    directing that the amount of the Transfers made to or on behalf of the Defendant be paid by the Defendant to the Trustee;

(b)    awarding post-judgment interest, costs, and reasonable attorneys' fees, to the extent permitted by law, through trial and any subsequent appeals; and

(c)    granting the Trustee such other and further relief as is just and proper.

## COUNT III

### Recovery of Avoided Fraudulent Transfers Pursuant to
### Section 550 of the Bankruptcy Code

87.    The Trustee repeats and realleges the allegations of paragraphs 1 through 86 as though fully set forth herein.

88.    The Defendant was either:   (i) the initial transferee of one or more of the Transfers or the entity for whose benefit Transfers were made; or (ii) an immediate or mediate transferee of an initial transferee.

89.    Accordingly, the Transfers, to the extent that they are avoided pursuant to sections 544 and 548 of the Bankruptcy Code, may be recovered by the Trustee pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

(a)    directing that the amount of the Transfers made to or on behalf of the Defendant be paid by the Defendant to the Trustee pursuant to section 550(a) of the Bankruptcy Code; and

(b)    granting the Trustee such other and further relief as is just and proper.

## COUNT IV

### Disallowance of Claims Pursuant to
### Section 502(d) of the Bankruptcy Code

90.     The Trustee repeats and realleges the allegations of paragraphs 1 through 89 as though fully set forth herein.

91.     Pursuant to section 502(d) of the Bankruptcy Code, any claim that the Defendant holds against the Debtors' estates should be disallowed unless and until the Defendant returns the amount of the Transfers to the Trustee.

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

(a)     pursuant to section 502(d) of the Bankruptcy Code, disallowing claims made by the Defendant unless and until such Transfers are returned to the Trustee; and

(b)     granting the Trustee such other and further relief as is just and proper.

## COUNT V

### Equitable Subordination Pursuant to
### Section 510 of the Bankruptcy Code

92.     The Trustee repeats and realleges the allegations of paragraphs 1 through 91 as though fully set forth herein.

93.     Under section 510(c) of the Bankruptcy Code, a court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim or interest to all or part of another allowed claim or interest, or order that any lien securing a subordinated claim be transferred to the estate.

94.     The Defendant's inequitable conduct in, among other things, participating in the Ponzi Scheme, or in accepting Transfers without fair consideration, caused injury to the Debtors' bankruptcy estates by artificially keeping the Debtors, which collectively operated in a highly leveraged and cash-flow negative manner, in business.

95.     To the extent that the Defendant accepted In-Kind Transfers, the Defendant committed additional inequitable conduct, in that it accepted services and benefits to which it knew (or should have known) it was not entitled.

96.     The Debtors' legitimate unsecured creditors, on the other hand, did not participate in the Defendant's inequitable conduct towards the Debtors.

97.     In fact, the Debtors' legitimate unsecured creditors were misled into extending additional credit to the Debtors without knowledge that the Debtors were temporarily being saved from bankruptcy or liquidation by the Defendant to the extent that it participated in the Ponzi Scheme despite having knowledge of its illegality.

98.     The Defendant's inequitable conduct resulted in a transfer of substantial value to the Defendant to the direct financial detriment of the Debtors' other unsecured creditors.

99.     Allowing the Defendant to receive payment on its alleged claims prior to, or *pari passu* with, payment of the Debtors' other unsecured creditors would be inequitable.

100.    Equitable subordination of the Defendant's claims is consistent with the Bankruptcy Code because it redresses the Defendant's improper conduct that directly harmed the Debtors' other unsecured creditors.

WHEREFORE, for the reasons stated herein, the Trustee respectfully requests that this Court enter an order:

(a)     equitably subordinating any and all claims held by the Defendant against the Debtors, whether on account of the Notes, Construction Repayments, or otherwise, to those claims held by the Debtors' general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code; and

(b)     granting the Trustee such other and further relief as is just and proper.

## COUNT VI

### Recharacterization of Debt as Equity, and Disgorgement

101.   The Trustee repeats and realleges the allegations of paragraphs 1 through 100 as though fully set forth herein.

102.   In substance (rather than form), any Investments made by the Defendant in the Ponzi Scheme should be considered contributions of equity rather than extensions of debt.

103.   Under these circumstances, the Court should disregard the form of such Investments, and declare that any debt extended to the Debtors by the Defendant should be recharacterized as infusions of equity (and payments made on behalf of such equity interests should be disgorged).

WHEREFORE, for the reasons stated herein, the Trustee respectfully requests that this Court enter an order:

(a)     recharacterizing all Investments extended to the Debtors by the Defendant, and disgorging any payments made to or on behalf of the Defendant on behalf of the same; and

(b)     granting the Trustee such other and further relief as is just and proper.

Dated:  September 1, 2006                    **DAVID R. BROWN, TRUSTEE**

By:      _____/s/ Thomas R. Fawkes_____
         One of His Attorneys

Harley J. Goldstein (No. 6256010)
Michael J. Kelly (No. 3128055)
Michael P. Kornak (No. 6237471)
Thomas R. Fawkes (No. 6277451)
FREEBORN & PETERS LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606-6677
Telephone:  312.360.6000
Facsimile:  312.360.6520

20